## JAMES S. BARKER AND REUBEN L. SIDWELL

### V.

## LIVINGSTON COUNTY NATIONAL BANK.

*Trover—Cribs of Corn—Instructions—Damages—Verdict—Impeachment of National Banks—Chattel Mortgage.*

1. The rule that the purchaser of a chattel must. in order to protect himself, take actual physical possession thereof, does not apply to property of a bulky nature which is practically irremovable.

2. It is a sufficient notice of a change of title to cribs of corn to place notices thereon stating that the contents belong to the purchaser. Trover will lie against the purchaser from the original owner of corn from cribs on which are posted such notices.

3. The appellant can not complain of the action of the court in giving an instruction for the adverse party similar to one asked by himself.

4. A juror can not impeach his own verdict by declarations made after the trial which would show his disqualification as a juror, or misconduct on the trial.

5. It *seems* that a national bank may take a chattel mortgage.

[Opinion filed May 25, 1889.]

APPEAL from the County Court of Livingston County; the Hon. N. J. PILLSBURY, Judge, presiding.

Messrs. STRAWN & PATTON, and STRAWN, TEWKESBURY & BARNES, for appellants.

Under the statute, it has been held that a chattel mortgage, not acknowledged or recorded, is binding between the parties, but void as to third persons. Gregg v. Sandford, 24 Ill. 17;

Forest v. Tinkham, 29 Ill. 141; McDowell v. Stewart, 83 Ill 538; Griffin v. Wertz, 2 Ill. App. 487.

And such unacknowledged and unrecorded instrument is void as to third persons, though they have actual notice. Porter v. Dement, 35 Ill. 478; Sage v. Browning, 51 Ill. 217.

And within the meaning of the statute, "third persons" are defined to be creditors, incumbrancers and purchasers. Sumner v. McKee, 89 Ill. 127.

Under this statute, allowing the mortgaged chattel to remain in the possession of the mortgagor contrary to the terms of the deed, is fraudulent *per se*, as to creditors, incumbrancers and purchasers, and admits of no explanation. Funk v. Staats, 24 Ill. 632.

As a general rule, the possession that would be sufficient to constitute a valid levy under an execution, to protect the property from third persons, is sufficient to protect mortgaged property where the possession of the mortgagee is relied upon in lieu of acknowledgment and recording under the statute, with this exception: in the case of an execution, third persons, having actual notice of the levy, are in no position to complain; but in the case of a mortgagee relying upon possession in lieu of acknowledgment and recording, the mortgage is void as to third persons unless the mortgagee had the actual possession required by law to make levy of an execution valid.

It is settled by a long line of decisions in this State that when the possession of mortgaged property remains with the mortgagor, unless the mortgage is acknowledged, and entry thereof is made in the docket of the officer taking the acknowledgment, and the mortgage is recorded pursuant to the requirements of the statute; the mortgage will be void as to purchasers and creditors of the mortgagor, even with actual knowledge of the mortgage, and that actual knowledge is not inconsistent with good faith. Sage v. Browning, 51 Ill. 217; McDowell v. Stewart, 83 Ill. 538; Frank v. Minor, 59 Ill. 444; Lemen v. Robinson, 59 Ill. 115; People v. Hamilton, 17 Ill. App. 599.

The change of possession from the mortgagor to the mort-

gagee must have publicity; it must be apparent to those who have occasion to observe it.   Flagg v. Pierce, 58 N. H. 295.

When the property is of a bulky nature, so that only a symbolical delivery can be made, and it is permitted to remain in a place where the possession may be equivocal, and doubts exist as to the sufficiency of the possession, they should be solved in favor of the purchaser or creditor, and against the mortgagee, because he had the power to protect himself by filing or recording his mortgage, and neglected to do so. Anderson v. Benneman, 44 Mich. 198.

As to ponderous, bulky property, on principle, the rule, as drawn from the authorities, is that the mortgagee must take the best possession that the nature of the property will admit of—that is, he must openly and unequivocally, by himself, personally, or through a duly authorized agent, assert dominion over it, and do everything that can reasonably be done to give publicity to that dominion.   May v. Tallman, 20 Ill. 443; Gaines v. Becker, 7 Ill. App. 315; Funk v. Staats, 24 Ill. 632; Ticknor v. McClelland, 84 Ill. 471; Chaplin v. Rogers, 1 East, 192; Jewett v. Warren, 12 Mass. 300; Rice v. Austin, 17 Mass. 197.

Many other cases might be cited, but the foregoing sufficiently illustrate the spirit of the law, and sustain the rule we have drawn from them.

Concurrent possession by the mortgagor and mortgagee is not sufficient to protect the property from creditors or purchasers.   Sumner v. Dalton, 58 N. H. 295; Hale v. Sweet, 40 N. Y. 97; Griffith v. Douglass, 73 Me. 532; Flagg v. Pierce, 58 N. H. 348.

As mere pledges, instead of chattel mortgages, exhibits A and B did not convey the title to the bank.   In case of a pledge the title remains with the pledgor, and the pledgee can not maintain trover.   By a mortgage, the title is transferred; by a pledge, the possession.   Jones on Pledges, Sec. 7; Walker v. Staples, 5 Allen, 34; Connor v. Carpenter, 28 Vt. 237; Brown v. Bement, 8 Johns. 96; Wright v. Ross, 36 Cal. 414; Tannahill v. Tuttle, 3 Mich. 104; Dook v. Bank of State, 6

Ired. L. 309; Jackson v. Rutherford, 83 Ala. 155; Evans v. Darlington, 5 Blackf. 320; Eastman v. Avery, 23 Me. 248.

Messrs. McILDUFF & TORRANCE, for appellee.

We think that the law, as well as the facts, warrants us in saying appellee had such possession of the corn as was good against appellants.

The rule laid down by our Supreme Court in the cases 'of Minor v. Herriford, 25 Ill. 344, Havely v. Lowry, 30 Ill. 446, and Davidson v. Waldron, 31 Ill. 120, cited by appellants, is held not to apply to a levy upon a crib of corn in Richardson v. Rardin, 88 Ill. 127. The acts done by the constable in that case were very similar to what was done in the case at bar.

An actual removal of an entire mass or cumbrous article (as a crib of corn) is not necessary to constitute a delivery and change of possession. May v. Tallman, 20 Ill. 443; Hart v. Wing, 44 Ill. 142.

Where growing wheat and corn are sold in good faith, being then on the farm of the seller, and the purchaser takes all the possession that is practicable before harvesting. and after the wheat is cut down, and before sufficient time elapses for him to remove it, it is seized on execution against the seller, the purchaser will be entitled to hold it on a trial of the right of property. Thompson v. Wilhite, 81 Ill. 356; Graff v. Fitch, 58 Ill. 374.

In Van Brunt v. Pike, 4 Gill, 270, S. C., 45 Am. Dec. 126, the Supreme Court of Maryland say constructive delivery of bulky articles, such as pig iron, at a distance from the place of contract, in care of an agent, is sufficient to pass title upon a present sale, and that it is good constructive delivery of bulky articles in care of agent of vendor at a distant place, for both vendor and vendee to notify him of the sale, and for the vendee to instruct him to ship the articles to his agent at another place, he agreeing to comply with such instructions, and that such sale and constructive delivery will defeat an attachment by creditors of such vendor, although the pig iron remains just as it was at the time of such sale.

The rule in Maryland as to a delivery of growing crops is the same as that in Illinois. Byer v. Etnyre & Besore, 2 Gill,

150; S. C., 41 Am. Dec. 410. See, also, Calkins v. Lockwood, 17 Conn. 154; S. C., 42 Am. Dec. 729.

In Vermont it is held that logs in a stream, or piled on its banks, are of such a cumbrous character and so situated as to pass as against creditors, by a bill of sale, without further delivery. Sanborn v. Kittredge, 20 Vt. 632; Kingsley v. White, 57 Vt. 565.

In the last case Ross, J., says: "To hold that such property comes within the operation of the ordinary rule would practically preclude any sale of it which would be valid against attachment by the creditors of the vendor. So in Wisconsin. Morrow v. Reed, 30 Wis. 81. To the same effect are Steam Mill Co. v. Brown, 37 Me. 1; S. C., 99 Am. Dec. 752; Jewett v. Warren, 12 Mass. 300.

If the property which is not within the actual possession of the owner be sold and delivered to the vendee, leaving it in the place where it was situated is not leaving it in the possession of vendor, and creditors should not be misled because it remains in the same locality. To presume, without inquiry, that it remains his, is an unwarrantable presumption. Morse v. Powers, 17 N. H. 286. See, also, Tuxworth v. Moore, 9 Pick. 347; S. C., 20 Am. Dec. 479.

There is a very full note to the case of Gibson v. Stevens, 8 How. 384, book 12, p. 1123 Law. Ed., and numerous cases are cited.

In Barney v. Brown, 2 Vt. 374, S. C., 19 Am. Dec. 720, it was held sufficient as against creditors of the seller to select a number of sheep out of a larger number, and, after marking them, leave them with the bailee of the seller where they had been. See, also, Straus v. Minzesheimer, 78 Ill. 492.

It has been held in the sale of a ship, that the transmission of a bill of sale is equivalent to a delivery to the vendee, and the transfer of title is perfected from the instant that the letter containing the bill is mailed, so as to entitle the vendee to the possession of the ship as against attaching creditors of the vendor, though the bill of sale is not received by the vendee till after the levy of the attachment. Begley v. Morgan, 15 La. 162; S. C., 35 Am. Dec. 188.

When there is any evidence tending to prove a change of possession, the question must be submitted to the jury. Warner v. Carlton, 22 Ill. 415; Stephenson v. Clark, 20 Vt. 624; Straus v. Minzesheimer, 78 Ill. 492.

When there is a conflict of testimony in regard to the change of possession, the question must necessarily be referred to a jury. Should a court in such a case attempt to assert authoritatively the presence of legal fraud, it would be usurping the rights of a jury. Forsyth v. Matthews, 14 Pa. 100; Wilson v. Hooper, 12 Vt. 653; Hodgkins v. Hook, 23 Cal. 581.

From the authorities it would seem that the facts of each particular case should be left to the jury to say whether there was a delivery of possession. In the case at bar that question was most favorably submitted for appellants and found against them. The testimony is conflicting, but there is sufficient evidence to sustain the verdict on that point.

C. B. SMITH, J. This was an action in trover, brought by appellee against appellant. A trial was had in the Circuit Court, which resulted in a judgment for appellee, and appellant brings the case here on appeal, and asks for a reversal.

The declaration alleges that on July 20, 1886, at Blackstone, in Livingston county, the plaintiff was lawfully possessed, as of its own property, of 24,000 bushels of corn, of the value of $10,000, and that plaintiff then and there lost the same, and that the same then and there came to the possession of the defendants by finding, and that, knowing the said corn to be the property of the plaintiff, defendants have not delivered it to the plaintiff on demand being made, but have, on the contrary, converted the same to their own use, etc. The plea was not guilty.

The facts disclosed by this record appear to be substantially these: The plaintiff was located and doing business at Pontiac, Illinois, under the name of "Livingston County National Bank." L. E. Kent & Co. was a firm composed of L. E. Kent, of Pontiac, and J. H. Brown, of Joliet. The business of this firm was buying and shipping grain from Pontiac, Cayuga, Nevada, Blackstone and Smithdale, all stations on C. & A. R.

R., in Livingston county. Kent was the active business manager of this firm, and, so far as this record discloses, had the entire management of all the business transactions of the firm. Barker and Sidwell, defendants mentioned in this record, were grain merchants in the city of Chicago. At the time of this controversy Joseph M. Greenebaum was president of the bank, and resided at Chicago. Henry G. Greenebaum was cashier and D. C. Eyler assistant cashier, and both resided at Pontiac. For a year or more before the beginning of this controversy Kent & Co. had been customers of the bank, and, so far as appears, everything had gone well until, on the 15th of February, 1886, Kent & Co. executed the two following papers to secure money then due the bank, viz.:

### Exhibit A.

"$2,500.                    Pontiac, Ills., Feb. 15, 1886.

"On June 1st, 1886, after date, for value received, we promise to pay to the order of Livingston Co. Nat. Bank twenty-five hundred dollars, at their office, in Pontiac, Illinois, with interest at eight per cent. per annum, after date.

"And, to secure the payment of said amount, we hereby authorize, irrevocably, any attorney of any court of record to appear for me in such court, in term time or vacation, at any time hereafter, and confess a judgment, without process, in favor of the holder of this note, for such amount as may appear to be unpaid thereon, together with costs and five per centum attorney's fees, and to waive and release all errors which may intervene in any such proceedings, and consent to immediate execution upon such judgment, hereby ratifying and confirming all that my said attorney may do by virtue hereof.

"L. E. Kent & Co.

"L. E. Kent.

"J. H. Brown."

"8,000 Bushels.                    Pontiac, Ills., Feb. 15, 1886.

"We have this day delivered into the possession of Livingston Co. National Bank of Pontiac, Illinois, eight thousand bushels of ear corn, stored in cribs located on land owned by

the Chicago and Alton Railroad Company in Nevada, Ill., each of the cribs or bins being marked with the name of Livingston County Nat. Bank, and numbered 'One' and 'Two.'

" This delivery is made by way of mortgage to the said Livingston Co. Nat. Bank as security for the above note, and for any further advances made or to be made by them to or for us, and one cent per bushel commission on said corn, and we agree to keep the said corn insured for their benefit (loss, if any, payable to them, and policies with this warehouse receipt or memorandum of delivery), at least to the amount of above note; and, upon their request, to procure it to be shelled and shipped, consigned to them or their order, as directed by them, at our own cost and expense. We guarantee the corn to be equal to the grade known in Chicago as No. 2, and the quantity and quality to hold out as stated on the arrival of the corn at Chicago; and if the above note be not paid at maturity, we hereby authorize the said Livingston Co. Nat. Bank to sell said corn at public or private sale, without notice, and apply the proceeds of such sale to the payment of said note. The above mentioned corn is free from all claims and incumbrances except those due said bank.

"L. E. KENT & Co."

"8,000 Bushels.         PONTIAC, ILL., Feb. 15, 1886.

" We have this day received, and agree to hold possession of, as the custodian of Livingston Co. Nat. Bank, of Pontiac, 8,000 bushels of ear corn, which is stored in cribs located on land owned by the C. & A. Railroad Co. at Nevada, Ill., each of the cribs or bins being marked with the name of Livingston Co. Nat. Bank, and numbered 'One' and 'Two.'

" And I agree to keep said corn in good order, and the cribs or bins in good repair, and to notify said bank by mail or telegraph, immediately, of any damage to, or interference with said corn. For all of which services I have received full compensation.      "——— ———, *Custodian.*"

EXHIBIT B.

" $5,000.         PONTIAC, ILL., Feb. 15, 1886.

" On June 1, 1886, after date, for value received, we promise to pay to the order of the Livingston County Nat. Bank, five

thousand dollars, at their office in Pontiac, Illinois, with interest at eight per cent. per annum after date.

"And, to secure the payment of said amount, we hereby authorize, irrevocably, any attorney of any court of record to appear for me in such court, in term time or vacation, at any time hereafter, and confess a judgment, without process, in favor of the holder of this note, for such amount as may appear to be unpaid thereon, together with costs and five per centum attorney's fees, and to waive and release all errors which may intervene in any such proceedings, and consent to immediate execution upon such judgment, hereby ratifying and confirming all that my said attorney may do by virtue hereof.

"L. E. KENT & Co.

"L. E. KENT.

"J. H. BROWN.

"16,000 Bushels.          PONTIAC, ILL., Feb. 15, 1886.

"We have this day delivered into the possession of the Livingston Co. Nat. Bank, of Pontiac, Illinois, sixteen thousand bushels of ear corn, stored in cribs located on land owned by L. E. Kent in Blackstone, Illinois, each of the cribs or bins being marked with the name of Livingston Co. Nat. Bank, and numbered 'One' and 'Two.'

"This delivery is made by way of mortgage to said Livingston Co. Nat. Bank as security for above note, and for any ·further advances made or to be made by them to or for us, and one cent per bushel commission on said corn, and we agree to keep said corn insured for their benefit (loss, if any, payable to them, and policies with this warehouse receipt or memorandum of delivery), at least to amount of above note; and, upon their request, to procure it to be shelled and shipped, consigned to them or their order, as directed by them, at our own cost and expense. We guarantee the quality of the corn to be equal to the grade known in Chicago as No. 2, and the quantity and quality to hold out as stated on the arrival of the corn at Chicago; and. if the above note be not paid at maturity, we hereby authorize the said Livingston Co. Nat. Bank to sell said corn at public or private sale, without notice, and

apply the proceeds of such sale to the payment of said note. The above mentioned corn is free from all claims and incumbrances except those due the Livingston Co. Nat. Bank.

"L. E. KENT & Co.

"16,000 Bushels.          PONTIAC, ILL., Feb. 15, 1886.

"I have this day received, and agree to hold possession of, as the custodian of the Livingston Co. Nat. Bank, of Pontiac, Ill., sixteen thousand bushels of ear corn, which is stored in cribs located on land owned by L. E. Kent in Blackstone, Ill., each of the cribs or bins being marked with the name of Livingston County National Bank, and numbered 'One' and 'Two.'

"And I agree to keep said corn in good order, and the cribs and bins in good repair, and to notify said Livingston County National Bank, by mail or telegraph, immediately, of any damage to, or interference with said corn. For all of which services I have received full compensation.

"JOHN RILEY,
"*Custodian.*"

To each of these notes is attached an acknowledgment of the delivery of the corn therein named to the bank, signed by Kent & Co., one of them being for 16,000 bushels and the other for 8,000 bushels. To both of these acknowledgments is also attached a statement explanatory of the delivery, showing its purpose to be for security for the note as well as for future advances.

To each of these papers is also attached what may be called a custodian's receipt, one of which (for the Blackstone corn) is signed by John Riley, custodian for the bank; the other receipt (for the Nevada corn) is not signed.

Counsel for appellants, in their argument, call this paper attached to the note a chattel mortgage, and insist that it shall be regarded as a chattel mortgage security. John Riley, the custodian of the Blackstone cribs, swears that the two cribs at Nevada, which are described in "Exhibit A," were filled up in the winter of 1885, and nailed up tight, and that he then, by direction of L. E. Kent, nailed boards on each of

these cribs, on which boards were the words, "This is the property of the Livingston Co. Nat. Bank." The same witness testified that he saw the same kind of boards, with the same words on them, on the two cribs at Blackstone, named in "Exhibit B," before the corn was shipped out, and that both the cribs at Blackstone were full of corn. The record also discloses the fact that prior to the date of Exhibits "A" and "B," L. E. Kent & Co. had been shipping grain to the defendants Barker & Sidwell, and there is evidence in the record tending strongly to prove that Kent & Co. were then in debt to Barker & Sidwell, and that they were pressing Kent & Co. for payment. The notes were neither of them paid at maturity. During the early part of June, 1885, L. E. Kent & Co. began shelling and shipping the corn out of these four cribs named in Exhibits "A" and "B," and continued to shell and ship such corn until it was nearly all shipped out. The two cribs at Nevada contained about 9,000 bushels, and the two cribs at Blackstone about 15,000 or 16,000 bushels. Of this 24,000 or 25,000 bushels of corn, all had been shelled and shipped to defendants except about 1,500 or 2,000 bushels at Blackstone, when, on the 24th day of July, the officers of the bank discovered for the first time, as they claim and swear, that Kent was selling the corn out of these cribs, when they immediately put a stop to any further shipment, and placed a man in charge of the remnant. There is no denial by Kent & Co., or by the defendants, that all this corn was shipped to Barker & Sidwell, but the fact is expressly admitted. So far there is no dispute about the facts, as we have stated them, except as to the posting the board notices on the cribs before the corn was shelled and sold. Defendants' counsel contend with great earnestness and zeal: 1. That the plaintiff did not show such possession of the corn as will entitle him to maintain trover, insisting that his possession was only such as the supposed chattel mortgage gave him; and, 2. That even if plaintiff had the actual possession of the corn, that he gave Kent authority to sell it for him; and, 3. That even if Kent had no authority to sell then it was sold with the knowledge and consent of plaintiff's custodian, John Riley; and, lastly, that even if the corn was

sold without the authority of the plaintiff or its agents, still that the defendants had no notice of any interest in the corn by the plaintiff, and that for that reason they are not liable.

The first and most important question involved is whether the bank had such possession or right of immediate possession of the corn as to enable them to maintain trover, and such possession as would charge strangers with notice of its right to the corn.

Unless the proof shows that the plaintiff was in the actual possession, or had the right to the immediate possession of the corn, then this action could not be maintained. But we think the proof in this case sufficiently shows that the bank had taken all the possession of these four cribs of corn which they could take, having regard to the bulky nature and amount of the property. The proof is clear, and really not disputed, that these cribs were all separate and distinct from what was known as "shipping cribs;" that when they were filled they were nailed up and closed, and boards nailed on all of them distinctly notifying everybody who would read that the corn belonged to the bank. John Riley swears he nailed up some of these boards and saw the others up, and Kent himself, over his own signature, states in Exhibits "A" and "B" that these cribs had been delivered into the possession and custody of the bank, and that these boards, giving the notice of such ownership, were nailed on the cribs. Riley swears he put the boards up at Nevada along in the winter, and saw them up at Blackstone afterward. On the 15th of February, 1886, Kent states in writing that these notices were on all these cribs; this was long before appellants bought the corn.

This testimony is only contradicted by two or three witnesses, who swear they did not see any boards on the cribs. This negative testimony is not sufficient to overcome the statements of the man who swears he put up the boards, and the written admission of Kent that the boards were up and delivery made.

What more could the bank have done to notify all the world of its ownership of the corn except to have stationed a

watchman at the cribs, or to have removed the corn out of the cribs and taken it to some other place? This the law does not require.

Counsel for appellant cites to us a great many authorities requiring a purchaser of a chattel to take actual physical possession in order to protect himself against the rights of third persons. Undoubtedly the rule is everywhere recognized that such possession as a purchaser can reasonably take must be taken. If the property is of such a nature that it can be removed, then it must be removed; but this rule does not apply to such property as is of a heavy and bulky nature and not easy or practicable to remove. No better illustration of the rule can be found than the case at bar. Here were four cribs containing about 25,000 bushels of corn, cribbed up at a place where the corn was intended to remain until it was shipped. Its removal was utterly impracticable, and would have involved the purchaser in large expense. It is the common knowledge of all men, and especially so with grain merchants, that the immense cribs of corn found at almost every railway station in this State, containing many thousands of bushels, are placed there to remain permanently, until shipped out on the cars to the various markets of the country, and it is equally well known that this grain is the subject of sale and transfer, and there is no hardship in requiring those who deal with this grain to first know who is the owner. The rule that heavy and bulky articles, such as cribs of corn, need not be removed in order to protect the purchaser, is expressly held in May v. Tallman, 20 Ill. 443. In that case the question arose over the title to a crib of corn containing only 300 bushels; the purchaser took two loads and the remainder was taken from him, and he brought trover to recover the value of the corn and had judgment, and it was affirmed.

In Hart v. Wing, 44 Ill. 141, the case was like the one at bar, and the question was whether a purchaser of a crib of corn was bound to remove it in order to protect himself, and it was held that it was not necessary for his protection against subsequent incumbrancers and purchasers; and the May case, *supra*, was cited with approval.

These two cases seem to be conclusive against appellant on the question of the sufficiency of the delivery, so as to protect appellee against subsequent purchasers. See, also, Tognine v. Kyle, 17 Nev. 209; Cartwright v. Phoenix, 7 Cal. 281; Haynes v. Hemsicker, 26 Pa. St. 58; and Chase v. Ralston, 26 Pa. St. 539. These latter cases are clear illustrations of the rule we have announced that a purchaser is not bound by the same rule to remove heavy and bulky goods that he is with articles that can be readily removed, in order to protect himself against subsequent purchasers.

In this view of the case it then becomes wholly immaterial whether Exhibits " A " and " B " contain a chattel mortgage or not. Under our statute, where the property mortgaged is delivered to the mortgagee and remains in his possession, no record of such mortgage is necessary. Delivery of the pos session of the property is as effectual as the acknowledgment and recording the mortgage. Wilson v. Pearson, 20 Ill. 81. We hold, then, that this corn was delivered by Kent & Co. to the bank by a proper and formal delivery, and that the bank took all the possession that was practicable or necessary to protect it against the claims of subsequent purchasers; and that the bank gave reasonable and proper notice to the world of its possession and ownership of the corn. But if it be conceded that the bank was not, in fact, the owner of this corn, but held it only as a security, bail or pledge for its debt, and had it in possession, still the bank would be entitled to maintain trover against a subsequent purchaser. Hutton v. Arnett, 51 Ill. 198.

Again, it is insisted that Greenebaum, the cashier of the bank, directed Kent to shell and ship this corn and sell it. This was denied by the bank, and the evidence upon the point was conflicting and was fairly submitted to the jury, and we can not say that their finding is not supported by the evidence.

It is in proof that Kent's subsequent conduct and declarations made to the bank officers were of such character as to be wholly inconsistent with his claim that Greenebaum had directed him to sell the corn; Greenebaum was dead, and could not contradict him at the trial. This was a vital point in the

case, and no doubt was fully considered by counsel, court and jury.   We see nothing in the evidence to justify us in saying the jury erred in their finding upon that point.   The written statement of L. E. Kent in Exhibits " A " and " B " flatly contradict him when he swears that there were no boards on the cribs in 1886, declaring the corn to be the property of the bank.

It is further urged by defendant that Riley, the custodian and agent of plaintiff for this corn at Blackstone, knew that Kent was shelling and shipping it, and that it was being done with Riley's knowledge and consent.   This Riley denies, and says he knew nothing of the fact that Kent was shipping out of these cribs at Blackstone until he was notified by Greenebaum, about the 24th or 25th of July, and that he then went immediately there, and found the corn all gone except 1,500 or 2,000 bushels, which they took charge of.   It is true Riley helped shell and ship the corn at Nevada, but he was not the custodian nor the agent of the bank for that corn, and the bank was not bound by his acts or his knowledge for the corn at Nevada.   He was there in the employ of Kent & Co. There is no proof that any corn was shelled or shipped out of the cribs at Blackstone with the knowledge or consent of Riley, so as to bind the firm by his act or knowledge.

The proof is that Kent & Co. were buying corn all the time at all these stations, and were shelling and shipping up to the time of their failure, which occurred after July, when they had shipped the corn in controversy.   At the same time they were drawing drafts through the bank, just as they had been doing before, and actually drew drafts through the plaintiff bank for all or nearly all this corn now in controversy, against the consignees, and the drafts were paid through plaintiff bank; but the evidence fails to show that the bank officers knew they were shelling the corn out of these four cribs included in Exhibits " A " and " B."   The fact that Kent & Co. were buying grain at several different stations and handling large amounts of grain and money every day in which the bank had no interest or claim, and which were paid through the bank, was all calculated to mislead them,

and at least furnished no grounds to suspect that Kent & Co. were shelling grain assigned and delivered to the bank. The bank was guilty of no negligence or fraud in not stopping the sale of this corn, or in not using the proceeds of drafts drawn against it, when it did not know that its corn was being shelled and the proceeds appropriated to other uses.

The defendants contend they had no notice of the rights of ownership or possession of the bank. · It may be true, as a matter of fact, that defendants had no actual notice or knowledge of the possession or ownership of the plaintiff.

But if this be true, whose fault was it ? Certainly not the fault of plaintiff. It did everything it could reasonably do to protect third persons, and everything the law required it to do to make known its title. Had the defendants been as vigilant in looking after the title to this large amount of corn and in guarding themselves against fraud as was the plaintiff in protecting its interest before they bought, they would have readily found that Kent & Co. had no title or right to sell the corn, and thus saved themselves from the loss that must fall upon them through their own neglect. But there is proof in the record, from Henry Greencbaum and Holdridge, that defendant Barker admitted that he knew of plaintiff's ownership of the corn before he bought it, and there is also proof of the declaration of L. E. Kent that he informed Barker also before he bought the corn that the bank owned it. This proof and these conversations with Greenebaum, Holdridge and Kent, defendant Barker denies. This was one of the controverted facts in the case fairly submitted to the jury, and we can not say that they found against the weight of the evidence.

Complaint is made that the court erred in giving certain instructions for the plaintiff upon an immaterial question. It is well settled that a party can not ask of the court improper or erroneous instructions or rulings in a case and then assign such action for error. The defendant asked and the court gave the same instruction to the jury which the court gave on the part of the plaintiff, and of which appellant now complains. This he can not do. Golden v. Mueller, 22 Ill. App. 527 ; Moline Plow Co. v. Anderson, 24 Ill. App. 366.

A great number of instructions were asked and given on both sides, and we are satisfied that the jury was correctly instructed, with the exception named above, and of which appellant can not complain, and that no substantial error was committed against the defendant. No specific objections are pointed out, and none have been discovered by us after a careful examination of all the instructions.

It is also claimed that the damages were excessive. Several witnesses testified that the price of corn at Nevada and Blackstone at the time it was taken was from forty to forty-two cents per bushel, and the proof shows that nearly 23,000 bushels of corn were taken. The verdict is really less than the proof would justify.

It is further objected that the court erred in not granting a new trial on the ground of the prejudice of the juror Bennett. This claim is based on a declaration alleged to have been made by Bennett after the verdict, that he did not believe what Kent swore to on the trial because he knew him too well. Conceding that the juror made this declaration (but which he denies), still it can not be received to impeach his verdict. It is well settled that a juror can not impeach his own verdict by declarations made after the trial which would show his disqualification as a juror, or to show misconduct on the trial. Allison v. The People, 45 Ill. 37 ; Nicolls v. Foster, 89 Ill. 386. The affidavit was properly rejected by the court.

But it is lastly urged that National banks have no right to take chattel mortgages. This objection has been overruled in Spafford v. The Bank, 37 Iowa, 181. But we do not think Exhibits "A" and "B" are in any sense chattel mortgages, or that the parties ever regarded them as such; they were not acknowledged or recorded. But even if they were chattel mortgages, the plaintiffs have reduced the property into possession, which amply protected it, under the authority of Hutton v. Arnett, 51 Ill. 198.

We have thus gone through this record and extended this opinion much beyond any legal propriety or necessity, and examined carefully every objection raised in the record by coun-

sel for appellant, because of the bitter complaint made by counsel against the verdict of the jury and the judgment of the court, and the earnest appeal made to us to reverse it because of the great injustice done to the defendants, and who, it is urged, will be ruined if they are compelled to pay this judgment. We are unable to find in this record any error committed by the court, or any injustice done to these defendants, or that they have been deprived of any legal right.

Finding no error in the record, the judgment must be affirmed.

*Judgment affirmed.*